297 F.3d 833
 M-S-R PUBLIC POWER AGENCY, Petitioner,
v.
BONNEVILLE POWER ADMINISTRATION, an agency of the United States, Respondent.
Columbia Falls Aluminum Company; Goldendale Aluminum Company; Kaiser Aluminum & Chemical Corporation; Northwest Aluminum Company; Reynolds Metals Company, Petitioners,
Industrial Customers of Northwest Utilities, Intervenor,
v.
Bonneville Power Administration, Respondent.
Alcoa Inc., Petitioner,
v.
Bonneville Power Administration, Respondent.
M-S-R Public Power Agency, Petitioner,
v.
Bonneville Power Administration, Respondent.
M-S-R Public Power Agency, Petitioner,
v.
Bonneville Power Administration, Respondent.
Alcoa Inc., Petitioner,
v.
Bonneville Power Administration, Respondent.
Columbia Falls Aluminum Company; Goldendale Aluminum Company; Kaiser Aluminum & Chemical Corporation; Northwest Aluminum Company, Petitioners,
v.
Bonneville Power Administration, Respondent.
 No. 99-71536.
 No. 99-71537.
 No. 99-71545.
 No. 00-71724.
 No. 01-70433.
 No. 01-70469.
 No. 01-70480.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted May 7, 2002.
 Filed July 11, 2002.
 As Amended August 9, 2002.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Paul M. Murphy, Murphy & Buchal LLP, Portland, OR, for the petitioners.
 James D. Pembroke, Duncan, Weinberg, Genzer, & Pembroke, P.C., Washington, DC, for the petitioners.
 Richmond F. Allan, Duncan, Weinberg, Genzer, & Pembroke, P.C., Washington, DC, for the petitioners.
 William B. Crow, Miller Nash LLP, Portland, OR, for the petitioners.
 William H. Walters, Miller Nash LLP, Portland, OR, for the petitioners.
 David J. Adler, Special Assistant United States Attorney, District of Oregon, Portland, OR, for the respondent.
 On Petition for Review of an Order of the Bonneville Power Administration.
 Before: TROTT, T.G. NELSON, Circuit Judges, and SHADUR,* District Judge.
 TROTT, Circuit Judge.
 
 
 1
 Pursuant to its 1996 Excess Federal Power Policy, the Bonneville Power Administration ("BPA" or "Bonneville") issues annual ten-year forecasts of the amount of "excess federal power" it anticipates will be available for sale to its customers during those years. Among those customers are the Petitioners: M-S-R Public Power Agency ("M-S-R"), a public entity located in California, and several aluminum companies ("Aluminum Companies") located in the Pacific Northwest.[1] M-S-R filed a timely petition challenging (1) BPA's method for calculating its 1999 and 2000 ten-year forecasts of excess federal power, (2) the timeliness of BPA's 1999 and 2000 written notices of available excess federal power, and (3) the timeliness of BPA's 2000 final ten-year forecast of excess federal power. The Aluminum Companies also challenged BPA's method for calculating excess federal power, but based their petition on different grounds than M-S-R.
 
 
 2
 This Court has original jurisdiction over these petitions pursuant to section 9(e)(5) of the Pacific Northwest Electric Power Planning and Conservation Act ("Northwest Power Act"), 16 U.S.C. § 839f(e)(5). We deny M-S-R's petitions challenging BPA's forecasts of excess federal power and dismiss for lack of jurisdiction M-S-R's timeliness claims. We grant the Aluminum Companies' petitions because BPA's method for forecasting excess federal power was contrary to clear congressional intent.
 
 BACKGROUND
 
 3
 In recent years, the demand for BPA's power has out-stripped its supply. Anticipating such power shortfalls, Congress instituted certain statutory directives and preferences that guide BPA's allocation of power while ensuring it operates "for the benefit of the general public, and particularly of domestic and rural consumers." 16 U.S.C. § 832c(a); see also Aluminum Co. of Am. v. Cent. Lincoln Peoples' Util. Dist., 467 U.S. 380, 393, 104 S.Ct. 2472, 81 L.Ed.2d 301 (1984) ("[T]he preference system ... determines the priority of different customers when the Administrator receives `conflicting or competing' applications for power that the Administrator is authorized to allocate administratively."). For instance, Bonneville must serve the power requirements of each "public body and cooperative" and each investor-owned utility, 16 U.S.C. § 839c(b)(1),[2] giving "preference and priority" to public bodies and cooperatives. 16 U.S.C. §§ 832c(a)-(b), 839c(a). By contrast, Bonneville is not obligated to sell any power to direct service industrial customers ("DSIs"), including the Aluminum Companies, which purchase power directly from BPA for their own use. 16 U.S.C. § 839c.[3]
 
 
 4
 Furthermore, Congress has prioritized the needs of Pacific Northwest customers over those of users outside the region. 16 U.S.C. §§ 832m(b)(1), 837a, 837b. Thus, BPA's sales of energy outside the region are limited to power that would otherwise be wasted, i.e., power "for which there is no market in the Pacific Northwest at any rate established for the disposition of such energy." 16 U.S.C. §§ 839f(c); 837(c). This power is called "surplus" power, and numerous restrictions are placed on its sale. Perhaps most significantly, surplus power is delivered only on a provisional basis, allowing BPA to recall surplus power deliveries or cancel future ones when necessary to meet the energy requirements of Pacific Northwest customers. 16 U.S.C. §§ 837b(a)-(b), 839f(c).
 
 Excess Federal Power
 
 5
 As the market for electric energy became more competitive in the early 1990s, BPA customers migrated to other providers, leaving BPA with an increasing amount of surplus power which, with its sales restrictions, was difficult to sell. In response, Congress passed the Water Development Appropriations Act of 1996 ("Excess Federal Power Act"), codified at 16 U.S.C. § 832m, which created a subspecies of surplus power called "excess federal power." Congress defined "excess federal power" as "electric power that has become surplus" due to:
 
 
 6
 any reduction in the quantity of electric power that the Administrator is contractually required to supply to [its public utility customers under 16 U.S.C. § 839c(b) and to its DSI customers under 16 U.S.C. § 839c(d)], due to the election by customers ... to purchase electric power from other suppliers, as compared to the quantity of electric power that the Administrator was contractually required to supply as of January 1, 1995.
 
 
 7
 16 U.S.C. § 832m(a)(3)(A).[4] The Excess Federal Power Act authorized Bonneville to sell power to non-regional customers without the statutory restrictions, including the right to recall, that applied to the sale of traditional surplus power. 16 U.S.C. § 832m(b).
 
 
 8
 In March 1996, BPA initiated notice and comment proceedings to develop a policy to interpret and implement its excess federal power marketing authority under 16 U.S.C. § 832m. The result was Bonneville's Excess Federal Power Policy ("EFP Policy") and the accompanying Record of Decision ("EFP-Decision"). 61 Fed.Reg. 50,810 (Sept. 27, 1996). The EFP Policy established the method for calculating excess federal power:
 
 
 9
 To determine the energy component of excess federal power, each year Bonneville will prepare a current forecast, in average megawatts, of Firm Contractual Obligations based upon its then-current contracts. In order to allow for sales or dispositions of excess federal power under Delayed-Delivery Contracts with delivery terms of up to 7 years, Bonneville will produce a 10-year annual energy (average megawatts) forecast of its then-current Firm Contractual Obligations. For each year of the forecast period, the excess federal power in firm energy from reductions in Firm Contractual Obligations will equal the difference between the forecasted Firm Contractual Obligations and 8298 aMW.
 
 
 10
 Id. at 50,811.[5] The 8298 aMW ("average megawatts") figure represented BPA's total firm energy obligations as of January 1, 1995; 2907 aMW were attributable to DSIs.
 
 
 11
 With the passage of the Northwest Power Act in 1980, Congress had directed BPA to offer twenty-year power sales contracts to its existing customers, including DSIs. 16 U.S.C. § 839c(g)(1); Ass'n. of Pub. Agency Customers, Inc. ("APAC") v. Bonneville Power Admin., 126 F.3d 1158, 1165 (9th Cir.1997). By mid-1999, Bonneville predicted that customer demand for energy after October 2001 — when its long-term contracts would expire — would outstrip supply and prevent Bonneville from fully servicing the DSIs' power needs. The parties entered into a "Compromise Agreement," under which BPA agreed to sell the DSIs a total of 1440 aMW annually starting in October 2001. Because 16 U.S.C. § 839c(d) authorized but did not obligate BPA to sell the DSIs any power, the Compromise Agreement amounted to a take-it-or-leave-it offer. Most DSIs took it. Following the Compromise Agreement, Bonneville used 1440 aMW rather than 2907 aMW as its power obligation to the DSIs in calculating its 1999 and 2000 ten-year forecasts for excess federal power.
 
 The Firm Sales Power Agreement
 
 12
 On September 30, 1997, Bonneville and M-S-R executed a contract for the sale of excess federal power. Though the contract was called the Firm Power Sales Agreement ("Sales Agreement"), the contract was really for excess federal power, as that term is defined in 16 U.S.C. § 832m, Bonneville's EFP Policy, and its EFP-Decision. The Sales Agreement guaranteed that BPA would sell M-S-R excess federal power through September 2004, and potentially until April 2013, "unless terminated earlier as provided for in section 13."[6] Section 13(b)(1) of the Sales Agreement required that Bonneville provide M-S-R with an annual forecast of available excess federal power for the upcoming ten years. Bonneville's determinations of future power were to be based on "the Excess Federal Power forecast, ... then-current methodologies and policies, and statutory or contractual obligations," and calculated "within the reasonable discretion of Bonneville."
 
 
 13
 Section 13(b)(2) required that BPA determine, within 30 days of issuing each ten-year forecast, whether the anticipated amount of excess federal power would cover M-S-R's energy needs "for the Contract Year that begins 6 Contract Years from October 1 of the then-current Contract Year." If Bonneville determined in any two consecutive years that it would have insufficient excess federal power to serve M-S-R's needs and properly notified M-S-R of this in writing, the Sales Agreement would of its own force terminate five years from the date shown on Bonneville's notice of termination. For example, if Bonneville's 1999 and 2000 forecasts predicted insufficient federal excess power for 2005, and the agency notified M-S-R of these determinations, the Sales Agreement would terminate five years from the date of the second notice.
 
 
 14
 Bonneville's 1999 Excess Federal Power Forecast and Notification Letter
 
 
 15
 On August 30, 1999, BPA issued its annual ten-year forecast projecting available excess federal power from August 1999 through July 2009. The forecast anticipated no excess federal power for 2003 thru 2006. In its letter of October 20, 1999, Bonneville notified M-S-R that no excess federal power would be available in 2004. This notice was the first of two necessary to terminate the Sales Agreement.
 
 
 16
 Bonneville's 2000 Excess Federal Power Forecast and Notification Letter
 
 
 17
 On September 28, 2000, BPA issued its annual ten-year forecast projecting available excess federal power from August 2000 through July 2010. BPA noted that its forecast was "based primarily on then-current and projected firm contractual obligations." Because Bonneville was in the midst of its subscription process, negotiating new regional power sales contracts for 2002 and beyond, the determinations of future available energy were "preliminary" — based on its best estimates of anticipated power sales. The preliminary forecast anticipated no excess federal power for any of the ten years. Bonneville promised its customers that a final determination would be issued within 30 days of the end of its contract subscription drive (scheduled to end in October), but it did not anticipate that the final sales numbers would differ from those in its preliminary forecast.
 
 
 18
 In its letter dated September 29, 2000, Bonneville notified M-S-R that Bonneville projected for the second consecutive year inadequate excess federal power to cover M-S-R's power needs in 2004. Accordingly, the Sales Agreement would terminate on September 30, 2005 — five years from the date of the letter.
 
 
 19
 On December 19, 2000, Bonneville issued its final ten-year forecast (the follow-up to the preliminary forecast from September). The final numbers reflected the recently signed subscriptions and, as predicted, the BPA foresaw no excess federal power for Operating Years 2002 through 2010. In its January 26, 2001 letter, Bonneville informed M-S-R that the final determination was indistinguishable from the preliminary forecast and would not affect the September 30, 2005 termination date of their Sales Agreement.
 
 Petitions for Review
 
 20
 M-S-R filed three petitions for review challenging: (1) Bonneville's reliance on factors other than its "then-current contracts" for its August 30, 1999 forecast of excess federal power, its determination of insufficient excess federal power to serve M-S-R's needs in 2005, and the timeliness of its October 20, 1999 notice of that determination; (2) Bonneville's reliance on factors other than its "then-current contracts" for its September 28, 2000 "preliminary forecast" of excess federal power, and the timeliness of its September 29, 2000 notice of that power determination; and (3) the timeliness of Bonneville's December 19, 2000 "final" excess federal power forecast. According to M-S-R, these "fatal flaws" render the 1999 and 2000 determinations of excess power "void and of no force or effect" and require this Court to enjoin the termination of the Sales Agreement.
 
 
 21
 The Aluminum Companies petitioned for review of the 1999 and 2000 forecasts on the ground that Bonneville violated 16 U.S.C. § 832m by treating energy that Bonneville refused to sell the DSIs as power that the DSIs freely elected to purchase from another provider. The Aluminum Companies request that this Court set aside the 1999 and 2000 determinations of federal excess power.
 
 DISCUSSION
 I Jurisdiction Over M-S-R's Petitions
 
 22
 Under section 9(e)(5) of the Northwest Power Act, the United States Courts of Appeals have exclusive original jurisdiction over an agency's "final actions and decisions" taken pursuant to the Northwest Power Act. 16 U.S.C. § 839f(e)(5). We determine whether we have jurisdiction over an action against BPA "by looking to the nature of the conduct challenged rather than the label given the cause of action." Pub. Util. Dist. No. 1 v. Johnson, 855 F.2d 647, 649 (9th Cir.1988). "For jurisdictional purposes, therefore, it matters not whether ... the suit is grounded in contract.... The proper inquiry focuses on the agency action being attacked and whether the factual basis for that attack is an agency action authorized by the Act." Pac. Power & Light Co. v. Bonneville Power Admin., 795 F.2d 810, 816 (9th Cir.1986); see also id. at 815-16 (finding jurisdiction because "[a]lthough the utilities' action is based upon their contracts with BPA, the effect of their action would be to challenge BPA's ratemaking").
 
 
 23
 Petitions for review based on contractual commitments rather than final agency actions fall outside this Court's original jurisdiction. The Tucker Act confers exclusive jurisdiction on the Court of Federal Claims for contract claims against the government exceeding $10,000. 28 U.S.C. § 1491(a)(1) (2002); Wilkins v. United States, 279 F.3d 782, 785 (9th Cir.2002). For contract claims involving up to $10,000, the Little Tucker Act lodges concurrent jurisdiction in the district courts and the Court of Federal Claims. 28 U.S.C. § 1346(a)(2).[7] In Public Utility District No. 1, for example, this Court considered whether our jurisdiction extended to the Public Utility District's claim that BPA breached an alleged contract to purchase one of the Public Utility District's power resources. 855 F.2d at 648. We determined that the result of the principal agency conduct at issue was "contractual commitments made outside the scope of the administrative record," not "final action taken pursuant to statutory authority." Id. at 650. Thus, these claims were dismissed for lack of jurisdiction.
 
 
 24
 Here, M-S-R petitions for review of two types of agency action. First, M-S-R contends that Bonneville failed to abide by the requirements of the Sales Agreement when forecasting excess federal power. Though M-S-R often couches its claims in breach of contract terms, it actually challenges a decision made pursuant to BPA's statutory authority. BPA's authority to forecast excess federal power derives from its EFP Policy, a policy it promulgated to implement the Excess Federal Power Act. Thus, Pacific Power's reasoning applies here because, at bottom, the petitions challenge decisions made pursuant to BPA's statutory authority. Despite their contractual aspects, M-S-R's challenges to BPA's excess federal power forecasts fall within this Court's jurisdiction.
 
 
 25
 M-S-R challenges also the timeliness of (1) Bonneville's notices of excess federal power, and (2) its December 2000 "final" excess federal power forecast (collectively "Timeliness Claims"). Unlike the requirement to forecast excess federal power, BPA's obligation to provide notice arose from the parties' Sales Agreement; neither statute nor agency regulation requires notice. Further, the Timeliness Claims are not in reality challenges to the excess federal power calculations; to contest the tardiness of BPA's notices of excess federal power is not necessarily to dispute the propriety of its power determinations. Thus, M-S-R's Timeliness Claims sound in contract, and we dismiss them for lack of jurisdiction.[8]
 
 II Standard of Review
 
 26
 The judicial deference accorded to an agency's decision varies according to the weight Congress intended that decision to carry. Our first question is always "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); id. at 843 n. 9, 104 S.Ct. 2778 ("The judiciary ... must reject administrative constructions which are contrary to clear congressional intent.").
 
 
 27
 On the other hand, where Congress expressly or implicitly confers authority to fill in a gap in the enacted law or resolve a statutory ambiguity, we accord the agency's ensuing decision considerable deference. United States v. Mead Corp., 533 U.S. 218, 229, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001); see also Chevron U.S.A., Inc. v. Echazabal, ___ U.S. ___, 122 S.Ct. 2045, 2049, 153 L.Ed.2d 82 (2002) (observing that ADA language permitting hiring qualifications that are "job related and consistent with business activity" created "spacious defensive categories, which seem to give an agency ... a good deal of discretion in setting the limits of permissible qualifying standards."); Dep't of Health & Human Servs. v. Chater, 163 F.3d 1129, 1133 (9th Cir.1998) ("We must give substantial deference to an agency's interpretation of its own regulations because its expertise makes it well-suited to interpret the language."). Thus, our review of final BPA actions is extremely limited. We must uphold such decisions unless arbitrary, capricious, or contrary to law. 16 U.S.C. § 839f(e)(2) (incorporating scope of review provision of Administrative Procedures Act, 5 U.S.C. § 706); Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv., 265 F.3d 1028, 1033-34 (9th Cir.2001). Under this narrow review, we assess "whether the agency considered the relevant factors and articulated a rational connection between the facts found and the choice made." Nat'l Marine Fisheries, 265 F.3d at 1034 (quotations omitted).
 
 
 28
 III Bonneville's Forecasts of Excess Federal Power
 
 
 29
 The Petitioners advance different grounds for challenging BPA's forecasts of excess federal power. M-S-R argues that BPA impermissibly based its 1999 and 2000 forecasts on considerations other than its "then-current" obligations for future power sales. M-S-R argues as well that BPA's 1999 forecast showed available excess federal power for 2005. The Aluminum Companies allege that BPA violated Congress's directive by treating power it refused to sell to the DSIs as excess federal power. We agree that BPA improperly calculated excess federal power, but only for the reason advanced by the Aluminum Companies.
 
 A. M-S-R's Petitions
 
 30
 Bonneville freely concedes that it considered projected power contracts when forecasting available excess federal power. M-S-R contends that Bonneville was obligated to base its ten-year forecasts of excess federal power solely on its then-current contracts and that its failure to do so rendered those forecasts invalid and the consequent termination of the Sales Agreement null and void. We disagree.
 
 
 31
 In the Excess Federal Power Act, Congress defined and authorized the sale of excess federal power but did not address the factors BPA must consider in forecasting its availability. 16 U.S.C. § 832m. In fact, Congress did not even require that BPA issue annual ten-year projections of excess federal power. Instead, Congress implicitly delegated to BPA the authority to develop the necessary procedures to implement the marketing of excess federal power. The mechanisms adopted by BPA in its EFP Policy and EFP-Decision represent the fruits of this delegation.
 
 
 32
 The EFP Policy provides that "Bonneville will produce a 10-year annual average energy ... forecast of its then-current Firm Contractual Obligations."[9] The purpose behind a ten-year forecast is to enable the sale of excess federal power under contracts calling for delivery months or years in the future. Bonneville's ability to negotiate these "delayed delivery" contracts depends at least in part on the accuracy of its long-range forecasts. To ignore anticipated or known but unexecuted contracts in a forecast that purports to determine these obligations would have been patently unreasonable. Moreover, Bonneville issued its 1999 and 2000 forecasts at a time when few, if any, signed power sales contracts were in effect beyond 2001. Thus, in these circumstances, it was eminently reasonable for Bonneville to ground its forecasts in the best information available at that time, i.e., predictions of future energy demand derived from its subscription process. BPA's consideration of these factors was neither arbitrary nor capricious.
 
 
 33
 We reach the same result in reviewing Bonneville's determination that it would not have sufficient excess federal power to serve M-S-R's needs in operating year 2005. Bonneville was obligated to serve M-S-R under their Sales Agreement through October 1, 2004. After that date, the obligation was conditional, based on the availability of excess federal power. In its 1999 forecast, Bonneville anticipated 504 aMW of excess federal power for operating year 2005. BPA's unconditional excess federal power obligations for 2005 — i.e., those contracts with customers who, unlike M-S-R, had unconditional claims to excess federal power — amounted to 751 aMW. Consequently, Bonneville determined that it could not serve M-S-R's needs for that year. We see nothing arbitrary or capricious about BPA accounting for its unconditional obligations before its conditional ones. Accordingly, we deny M-S-R's petitions challenging BPA's forecasts of excess federal power.
 
 B. Aluminum Companies' Petitions
 
 34
 The Aluminum Companies challenge the BPA's calculation of excess federal power, claiming BPA flouted the Excess Federal Power Act, 16 U.S.C. § 832m(a)(3)(A), by treating power it refused to sell as power the DSIs elected not to purchase. We agree.
 
 1. Standing
 
 35
 "The federal courts are under an independent obligation to examine their own jurisdiction, and standing `is perhaps the most important of [the jurisdictional] doctrines.'" FW/PBS, Inc. v. Dallas, 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) (quoting Allen v. Wright, 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). Article III's "case" or "controversy" provision creates an "irreducible constitutional minimum" of standing for all federal court plaintiffs:
 
 
 36
 (1) that the plaintiff have suffered an "injury in fact" — an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there be a causal connection between the injury and the conduct complained of — the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) that it be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.
 
 
 37
 Bennett v. Spear, 520 U.S. 154, 167, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997).
 
 
 38
 The Aluminum Companies have alleged a cognizable injury. When making its 1999 and 2000 excess federal power forecasts, BPA considered 1440 aMW rather than 2907 aMW as its obligation to the DSIs. The difference — 1467 aMW — represented excess federal power that enabled BPA to honor 1467 aMW worth of contracts for excess federal power. The 1467 aMW also constituted power that was no longer available for Bonneville's power contracts with the DSIs. BPA would be forced to make up for the resulting shortfall by purchasing additional power from an outside source and passing the cost of this additional power on to the DSIs through higher rates. Though this increased cost will not be felt until 2004, the cost is certain to accrue and, under the relevant statutory limitations period, can be challenged only now. Thus, the Aluminum Companies identify a concrete injury.
 
 
 39
 It is evident that the causation and redressability elements of standing are also met. The alleged injury — the increased cost of energy — results from the challenged conduct — namely, BPA's method of calculating excess federal power. Further, the relief sought by the Aluminum Companies — setting aside Bonneville's 1999 and 2000 determinations with instructions to recalculate excess federal power using 2907 aMW instead of 1440 aMW — would remedy their injury. Bonneville's recalculation of excess federal power using 2907 aMW instead of 1440 aMW would decrease the amount of excess federal power available for sale, thereby increasing the amount of power available to cover the DSIs' contracts and reducing BPA's need to purchase power from an outside vendor to meet its obligations to the Aluminum Companies. The less outside power BPA purchases, the lower the cost of power to the Aluminum Companies. Therefore, the Aluminum Companies have standing to bring their petitions.
 
 
 40
 2. BPA's Calculation of Excess Federal Power Under 16 U.S.C. § 832m
 
 
 41
 The EFP Policy established 8298 aMW as a fixed baseline against which BPA's future reductions in power obligations would be compared for purposes of calculating excess federal power. Of the 8298 aMW, 2907 aMW were allocated to its DSI customers. The parties agree that the DSIs would have purchased significantly more than 1440 aMW had BPA offered more for sale. Nonetheless, Bonneville treated its refusal to sell the DSIs more than 1440 aMW of power as an election by the DSIs to purchase no more than this amount. By doing so, the Aluminum Companies argue, Bonneville flouted Congress's intent.
 
 
 42
 While we generally accord substantial deference to BPA's decisions interpreting its organic statutes, extending such deference is unwarranted where, as here, Congress has squarely addressed the issue. Chevron, 467 U.S. at 842-43, 104 S.Ct. 2778. In the Excess Federal Power Act, Congress defined excess federal power in plain terms — reduced energy obligations "due to the election by customers ... to purchase power elsewhere." 16 U.S.C. § 832m(3)(A) (emphasis added). This language makes clear that Congress intended that excess federal power arise from decisions of BPA's customers, not the agency itself. Therefore, Bonneville violated Congress's directive by treating power it refused to sell as power the DSIs elected not to purchase.
 
 
 43
 Though the plain language of 16 U.S.C. § 832m settles the matter, we find two additional bases for our holding. First, reading "due to the election by customers," as BPA does, to include any reduction in firm power obligations would render the "election by customers" language mere surplusage — a violation of a well-established principle of statutory construction. See, e.g., Duncan v. Walker, 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001) ("It is our duty to give effect, if possible, to every clause and word of a statute. We are thus reluctant to treat statutory terms as surplusage in any setting.") (internal citations and quotations omitted). Second, Bonneville's interpretation of 16 U.S.C. § 832m clashes with the statute's legislative history:
 
 
 44
 This legislation poses no significant risk or cost to Bonneville's regional customers because the only power sold outside the region without the restrictions is power abandoned by regional customers and excess power generated or purchased for the benefit of fish and wildlife. No other amount of power can be sold outside the region without such restrictions.
 
 
 45
 H.R.Rep. No. 104-293, H 10974 (1995) (emphasis added).
 
 
 46
 When BPA approached the DSIs with a take-it-or-leave-it offer to purchase 1440 aMW, their acceptance was not the sort of freely chosen election that Congress envisioned. Holding to the contrary would allow Bonneville to liberate 2907 aMW for sale outside the region by refusing to sell the DSIs a single megawatt of power — a result manifestly at odds with Bonneville's obligation to "operate[] for the benefit of the general public, and particularly of domestic... customers." 16 U.S.C. § 832c(a) (emphasis added). We therefore grant the Aluminum Companies' petitions.
 
 CONCLUSION
 
 47
 We deny M-S-R's petitions challenging Bonneville's forecasts of excess federal power and dismiss for lack of jurisdiction its petitions attacking the timeliness of Bonneville's 1999 and 2000 notices of available power and the 2000 final forecast of federal excess power. We grant the Aluminum Companies' petitions challenging these same forecasts because Bonneville's calculation of excess federal power was contrary to the unambiguous language of 16 U.S.C. § 832m. We therefore vacate Bonneville's 1999 and 2000 forecasts and remand with instructions to reissue forecasts consistent with 16 U.S.C. § 832m and this decision.
 
 
 48
 DISMISSED in part, DENIED in part, VACATED and REMANDED in part.
 
 
 
 Notes:
 
 
 *
 The Honorable Milton I. Shadur, Senior United States District Judge for the Northern District of Illinois, sitting by designation
 
 
 [1]
 Alcoa, Inc., Columbia Falls Aluminum Company, Goldendale Aluminum Company, Kaiser Aluminum & Chemical Corporation, and Northwest Aluminum Company
 
 
 [2]
 Also referred to as section 5(b) of the Northwest Power Act
 
 
 [3]
 Also referred to as section 5(d) of the Northwest Power Act
 
 
 [4]
 Section 832m(a)(3)(B) identifies a second, potential source of excess federal power that is not relevant to this case
 
 
 [5]
 The EFP-Decision reiterated this process
 
 
 [6]
 The Sales Agreement identified M-S-R's annual energy needs as 75 aMW
 
 
 [7]
 Where, as here, a petitioner seeks equitable relief rather than damages, he may go wantingSee N. Star Alaska v. United States, 9 F.3d 1430, 1432 (9th Cir.1993) (en banc) (per curiam) ("Generally speaking, the Tucker Act does not permit the claims court to grant equitable or declaratory relief in a contract dispute case.").
 
 
 [8]
 Though we lack jurisdiction to consider the merits of these claims, we note that M-S-R mischaracterizes the support for its position. M-S-R contends that its Sales Agreement "unequivocally requires" that BPA issue (1) a "firm and final" ten-year forecast within each "contract year,"i.e., between October 1 and September 30, and (2) a "firm and final" notice of excess federal power "within thirty days" of the forecast. Both claims are incorrect. First, the Sales Agreement requires that Bonneville issue an annual ten-year forecast of excess federal power within each contract year, but makes no mention that such notice be "firm and final." Second, section 13(b)(3)(A) of the Agreement — entitled "Availability Notice to M-S-R" — only requires that Bonneville provide notice of its annual excess federal power determinations; the Agreement is silent about when notice must be given. M-S-R's reliance on the Sales Agreement appears misplaced.
 
 
 [9]
 Firm Contractual Obligations were defined as those "sales or other dispositions of power entered into under" 16 U.S.C. § 839c(b), (d). 61 Fed.Reg. at 50,810