**SAN LUIS & DELTA–MENDOTA WATER AUTHORITY and Westlands Water District, Plaintiffs,**

v.

**UNITED STATES DEPARTMENT OF the INTERIOR, et al., Defendants.**

**Save San Francisco Bay Assoc., et al., Plaintiffs,**

v.

**United States Department of the Interior, et al., Defendants.**

**Nos. 1:97–CV–6140 OWW DLB, 1:98–CV–5261 OWW DLB.**

United States District Court, E.D. California.

May 14, 2009.

Daniel Joseph O'Hanlon, Kronick, Moskovitz, Tiedemann & Girard, Jon David Rubin, Diepenbrock Harrison, Sacramento, CA, Diane Van Atta Rathmann, Lisa and Lisa, Phoenix, AZ, Thomas William Birmingham, Westlands Water District, Fresno, CA, Cynthia L Koehler, Thomas Jacob Graff, Environmental Defense Fund, Oakland, CA, Paul A. Peters, Kaufman and Logan, Hamilton Candee, Natural Resources Defense Council, Lawrence A. Hobel, Heller Ehrman LLP, San Francisco, CA, for Plaintiffs.

Charles Ray Shockey, Maria A. Iizuka, U.S. Department of Justice, Sacramento, CA, Clifford Thomas Lee, California Attorney General's Office, San Francisco, CA, Gregory K. Wilkinson, Best Best & Krieger, Riverside, CA, for Defendants.

## MEMORANDUM DECISION RE MOTION FOR RECONSIDERATION (DOC. 715)

OLIVER W. WANGER, District Judge.

### I. *INTRODUCTION*

Before the court for decision is San Luis & Delta–Mendota Water Authority ("Authority") and Westlands Water District's ("Westlands") (collectively, "Plaintiffs") motion for reconsideration of the September 19, 2008 Corrected Memorandum Decision and Order granting in part and denying in part cross-motions for summary judgment. Doc. 715, filed Nov. 18.2008. Stockton East Water District, Plaintiff–in–Intervention, joins this motion. Doc. 719, filed Nov. 21 2008.

## II. *BACKGROUND*

### A. *Statutory Text.*

This case concerns the statutory text of CVPIA section 3406(b) (2):

(b) FISH AND WILDLIFE RESTORATION ACTIVITIES.—The Secretary [of the Interior], immediately upon the enactment of this title, shall operate the Central Valley Project to meet all obligations under state and Federal law, including but not limited to the Federal Endangered Species Act, 16 U.S.C. 1531, et seq., and all decisions of the California State Water Resources Control Board establishing conditions on applicable licenses and permits for the project. The Secretary, in consultation with other State and Federal agencies, Indian tribes, and affected interest, is further authorized and directed to:

\* \* \*

(2) upon enactment of this title dedicate and manage annually eight hundred thousand acre-feet of Central Valley Project yield for the primary purpose of implementing the fish, wildlife, and habitat restoration purposes and measures authorized by this title; to assist the State of California in its efforts to protect the waters of the San Francisco Bay/Sacramento–San Joaquin Estuary; and to help meet such obligations as may be legally imposed upon the Central Valley Project under state or federal law following the date of enactment of this title, including but not limited to additional obligations under the federal Endangered Species Act. . . .

Pub.L. No. 102–575, § 3406(b)(2), 106 Stat. 4700, 4714 (1992).

### B. *Prior District Court and Ninth Circuit Rulings.*

This (b)(2) language has been the subject of a series of protracted lawsuits, culminating in orders in these consolidated cases at the district and appellate court levels. As those decisions comprehensively recount this history, only a brief recap is necessary.

The CVPIA took effect October 31, 1992. In 1998, Plaintiffs challenged Federal Defendants' October 5, 1999 "Final Decision on Implementation of Section 3406(b)(2) . . .," contending that Federal Defendants were required to credit against the 800,000 AF allocation of CVP yield all water used to satisfy either the 1995 Water Quality Control Program for the San Francisco Bay/Sacramento–San Joaquin Estuary ("1995 WQCP") or post-CVPIA Endangered Species Act ("ESA") requirements. *See* Doc. 466 at 26. The district court granted Plaintiffs' motion for summary judgment, concluding: "[A]s a matter of law, [the statutory] language is not ambiguous—water used to meet WQCP or post-CVPIA ESA requirements is an additional (b)(2) purpose and must be charged against the 800 TAF [thousand acre-feet] (b)(2) mandate if so used." *Id.* at 33. The district court further found that to "hold otherwise would render the 800 TAF figure superfluous." *Id.* at 35. On March 20, 2002, partial final judgment was entered in favor of Plaintiffs on that claim, and the issue was certified for interlocutory appeal to the Ninth Circuit. Doc. 491 at 4.

On appeal, Environmental Plaintiffs argued that the district court "improperly elevated the subordinate purpose of the (b)(2) dedication over the primary purpose." Envt'l Appellants' Opening Brief, 2002 WL 32123196 *36 (9th Cir. Dec.23, 2002). In response, Plaintiffs argued that "the plain words of the statute dictate and Congress intended that all water used to assist the State in protection of the Bay/Delta, or to meet obligations (including ESA obligations) legally imposed upon the CVP under State or Federal law fol-

lowing the date of enactment of CVPIA, would be counted toward the 800,000 acre-feet limit." Appellants' Brief in Answer to Envt'l Appellants' Opening Brief, 2003 WL 21471613 *27, (9th Cir. Jan.30, 2003). In reply, Environmental Plaintiffs emphasized that "the CVPIA cannot defeat the statute's specific and non-discretionary directions to Interior to use the 800,000 AF for the 'primary purpose' of implementing the CVPIA's new restoration measures, and to achieve the CVPIA's salmon doubling mandate." Envt'l Appellants' Reply Brief, 2003 WL 21471615 *13 (9th Cir. Feb.18, 2003).

The Ninth Circuit, in a ruling initially issued June 3, 2003 and amended January 23, 2004, affirmed the district court's partial final judgment on four of five issues, but reversed regarding (b) (2) accounting discretion:

The district court erred in concluding that Interior lacks discretion to refrain from crediting the amount of Project yield actually used for any (b)(2) purpose against the designated 800,000 acre feet of Project yield. *To hold otherwise would defeat the primary purpose for which the 800,000 acre feet were designated-fish, wildlife, and habitat restoration.* Section 3406(b)(2) provides that the "primary purpose" to which the 800,-000 acre feet should be dedicated is the implementation of "fish, wildlife, and habitat restoration purposes authorized by this title ..." Section 3406(b)(2) also provides that the 800,000 acre feet may be used to "help" meet obligations under the Endangered Species Act and to "assist" in meeting water quality standards. If Interior were required to deduct some or all the water it uses for water quality and Endangered Species Act purposes from the (b)(2) dedication, the water needed for implementation of the Improvement Act's restoration mandate could be relegated to a secondary role, or perhaps no role at all. Such a sce-

nario would directly conflict with the Interior's mandate to give effect to the hierarchy of purposes established in Section 3406(b)(2)

*Bay Institute of San Francisco v. United States,* 87 Fed.Appx. 637 at 639–40 (9th Cir.2004) (emphasis added).

C. *The September 19, 2008 Ruling.*

The September 19, 2008 Memorandum Decision summarizes the parties arguments on summary judgment as follows:

Plaintiffs assert that "primary purpose" should be interpreted broadly, to include the 159,200 AF designated as "Non-B2 Fishery Actions" in late June and August/September 2004, because those actions benefitted fish. (Doc. 681 at 9.) They suggest that any water used to meet WQCP and/or ESA purposes must be counted *unless* doing so would *not* serve any fish, wildlife, and habitat restoration purposes, *or* if counting the water toward the 800,000 AF limit would "significantly impair" the primary restoration purposes. (*Id.*) However, when "water is used pursuant to the mandates of the [WQCP] or the ESA to further fish and wildlife restoration," Plaintiffs maintain that such use "serves the primary purpose and effectuates the hierarchy of purposes set in section 3406(b)(2)." (*Id.* at 7.) Plaintiffs maintain that the Ninth Circuit could not have intended to emasculate the 800,000 AF limit by granting Interior "unfettered discretion to exclude from its accounting of (b)(2) water any water dedicated to fulfill environmental obligations emanating from other statutes." (*Id.* at 8.) This, they argue, would run afoul of the cannon of statutory construction that requires effect be given to every provision in a statute.

Federal Defendants rejoin that Interior properly exercised its discretion to designate the 159,200 AF as "Non–B2

Fishery Actions" in late June and August/September 2004, because that water did not serve the "primary purpose" of the CVPIA. (*See* Doc. 658–3 at 24.) Federal Defendants argue that the Ninth Circuit's decision construed (b)(2) broadly to uphold the agency's ability to carry out the CVPIA's "restoration mandate," holding that if "Interior were required to deduct some or all of the water it uses for water quality and Endangered Species Act purposes from the (b)(2) dedication," then the water needed to implement the restoration mandate could be relegated to a secondary role, or "perhaps no role at all." 87 Fed.Appx. at 640. That result, "would directly conflict with Interior's mandate to give effect to the hierarchy of purposes established in Section 3406(b)(2)." *Id.* Federal defendants insist that the Court of Appeals' decision must be read as a command to Interior to ensure that it exercises its discretion in a manner that will not frustrate the primary purpose of fish, wildlife and habitat restoration. This is a partial truth, as the 800,000 AF cap on CVP yield that must be annually dedicated to (b)(2) purposes is not discretionary and can only be reduced in times of water shortage.

Environmental Plaintiffs add that the primary purpose of the CVPIA is anadromous fish doubling and that Interior retains the discretion to refrain from counting actions that use CVP yield for other purposes if doing so would give effect to the hierarchy of purposes. (Doc. 686 at 9.) Environmental Plaintiffs emphasize that "since the Ninth Circuit has expressly held that Interior may— indeed must—prioritize (b)(2) water for the CVPIA's restoration mandate beyond mere compliance with the CVP's water quality obligations, there will be years in which the sum of the actions taken under Section 3406(b)(2), the WQCP, and the ESA will exceed 800,000

AF." (*Id.* at 6.) Environmental Plaintiffs maintain that "[t]here is nothing illegal or inappropriate about this. Interior is required to provide water for fishery purposes under several statutes. As the appellate court decided, Section 3406(b)(2) did not simply subsume the CVP's water quality obligations. Contrary to the position of [the Authority], the 800,000 AF dedication is not a cap on the CVP's environmental water obligations." (*Id.*)

The parties all agree that under the Ninth Circuit's decision, Interior retains some degree of discretion to refrain from deducting water from the (b)(2) account if doing so will give effect to the hierarchy of purposes in the CVPIA. The dispute in this case arises over the nature and extent of that discretion. The fundamental disagreement is, essentially, over the scope and meaning of the phrase "primary purpose," as that term is used in the Ninth Circuit's decision.

Doc. 711 at 33–36 (footnotes omitted) (emphasis in original).

The September 19 Decision defines the scope and meaning of the phrase "primary purpose":

The Ninth Circuit explained in general that the "primary purpose to which the 800,000 acre feet should be dedicated is the implementation of 'fish, wildlife, and habitat restoration purposes authorized by this title....' " Bay Institute, 87 Fed.Appx. at 639–40 (quoting CVPIA 3406(b)(2)). Plaintiffs suggest that the "primary purpose" includes any action designed to help fish, while Environmental Plaintiffs and Federal Defendants suggest that the "primary purpose" is the anadromous fish doubling program set forth in section 3406(b)(1). (Doc. 686 at 9; Doc. 696 at 19 n. 3 (Federal Defendants "generally agree" with Environmental Plaintiffs' position on this issue).)

* * *

The "primary purpose" includes all those fish and wildlife restoration activities specifically described in section 3406(b). This includes water dedicated to accomplish the anadromous fish doubling goal set forth in section 3406(b)(1), but also includes water needed to accomplish any of the other specifically enumerated programs listed in section 3406(b) (e.g., 3406(b)(4), (5), (8), (9), (12), (18) & (19)). The structure and placement by Congress of these express provisions must be considered.

* * *

Under the Ninth Circuit Decision, Interior has discretion not to count water used for any of the (b)(2) "secondary" purposes, so long as that water is "needed" to effectuate the "primary" restoration programs specifically enumerated in section 3406(b), including the fish doubling program contained within 3406(b)(1). *The primary purpose language does not globally encompass every action that benefits fish. Rather, it applies only to those actions that support the specifically enumerated fish and wildlife restoration programs contained within 3406(b).*

*Id.* at 36, 43, 45 (emphasis added).

The Decision recognized that there is "potential for overlap between the 'primary' purpose and actions taken pursuant to the fisheries purposes of the WQCP and ESA."

> For example, 3406(b)(1)(c) provides:
>
> The Secretary shall cooperate with the State of California to ensure that, *to the greatest degree practicable,* the specific quantities of yield dedicated to and managed for fish and wildlife purposes under this title are credited against any additional obligations of the Central Valley Project which may be imposed by the State of California

following enactment of this title, including but not limited to increased flow and reduced export obligations which may be imposed by the California State Water Resources Control Board in implementing San Francisco Bay/Sacramento–San Joaquin Delta Estuary standards pursuant to the review ordered by the California Court of Appeals in *United States v. State Water Resources Control Board,* 182 Cal.App.3d 82, 227 Cal.Rptr. 161 (1986), and that, to the greatest degree practicable, the programs and plans required by this title are developed and implemented in a way that avoids inconsistent or duplicative obligations from being imposed upon Central Valley Project water and power contractors.

(Emphasis added.)

Interior recognized the potential for this overlap in its December 2003 Guidance, which provides:

> [A]ctions taken pursuant to the 1995 Water Quality Control Plan and State Water Resources Control Board Decision D–1641 ("the 1995 WQCP") involve the dedication and management of Central Valley Project yield for long-term fishery beneficial use and protection. Such actions are not taken to help meet agricultural or municipal and industrial water quality standards that are set forth in the 1995 WQCP. Most of the fishery beneficial uses and objectives under the 1995 WQCP and in Reclamation's water rights permits help fulfill the fish, wildlife, and habitat restoration purposes and measures authorized by Section 3406(b). Consistent with the June 3, 2003 Ninth Circuit decision, much of the (b)(2) water that is dedicated and managed annually to help meet fishery beneficial use and protection objectives of the 1995 WQCP

serves Section 3406(b)(2)'s "primary purpose" of fish, wildlife, and habitat restoration. Therefore the implementation of Section 3406(b)(2) in accordance with the May 9, 2003 Decision and with this supplemental guidance effectuates the "hierarchy of purposes" in Section 3406(b)(2).

(AR 2156–57[ ].)

In practice, many actions taken to fulfill the fishery beneficial uses and objectives of the WQCP and/or actions taken to comply with the ESA may serve the primary purpose of the CVPIA. In keeping with the general structure of the CVPIA's language, if the "primary" purpose of any action taken under the WQCP and/or the ESA is to support or effectuate a "primary purpose" program, such action must be counted toward the (b)(2) account. Environmental Plaintiffs advance a helpful definition of the term "primary," the ordinary meaning of which is "predominant," of "first importance," or "principal." *See Malat v. Riddell,* 383 U.S. 569, 572, 86 S.Ct. 1030, 16 L.Ed.2d 102 (1966). Applying this definition, if an action taken under the WQCP and/or the ESA predominantly contributes to one of the primary purpose programs (e.g., fish doubling), it must be counted toward the 800,000 AF limit. Interior retains the discretion not to count other secondary actions, so long as doing so is necessary to give effect to the hierarchy of purposes.

*Id.* at 46–48 (footnotes omitted).

This "primary purpose" definition was applied, resulting in a finding that Interior did not abuse its discretion in connection with two sets of actions for which water was released but not charged against the annual (b)(2) account:

From June 17 through June 24, 2004 Interior allocated 9,100 AF to Non–B2 Fishery Actions. The daily accounting for June 17 through June 30, 2004 indicates that water costs were being incurred for changes in operations at Nimbus, Clear Creek, and New Melones. (First Fujitani Decl. at ¶ 17.) Only those costs incurred at Nimbus and New Melones were accounted for as Non–B2 Fishery Actions. (*Id.*) A draft document entitled "Summary of (b)(2) Fish Actions for Water Year 2004," dated December 1, 2004, specifies that releases from Nimbus during the "latter part" of June were "to meet Delta demands." (AR 1521.) Mr. Fujitani states that releases from Nimbus were required to meet the June Delta outflow standard. (First Fujitani Decl. at ¶ 17.) Releases from New Melones were needed to meet San Joaquin River flow requirements at Vernalis. (*Id.*) Interior did not count these releases as "(b)(2)" releases, but instead as "Non–B2 Fishery Actions." (*Id.*)

The question presented is: Did either of these actions predominantly contribute to one of the (b)(2) primary purpose programs (e.g., fish doubling)? The Delta outflow standard was promulgated as part of the 1995 WQCP (D–1641). The stated purpose of the outflow standard is to protect "estuarine habitat for anadromous fishes and other estuarine-dependent species." (1995 WQCP at 15.) The Vernalis flow requirement on the San Joaquin River, along with similar flow requirement on the Sacramento River, originate in the WQCP. The stated purpose of the Vernalis flow requirements are "to provide attraction and transport flows and suitable habitat for various life stages of aquatic organisms, including Delta smelt and chinook salmon." (*Id.* at 15.)

Although both of these standards are to benefit anadromous fish species, they do not specifically identify an intent to support the fish doubling goal (or any other specifically-enumerated 3406(b) program). In fact, the WQCP contains a

wholly separate "narrative objective" for salmon doubling, which provides: "Water quality conditions shall be maintained, together with [other] measures in the watershed, sufficient to achieve a doubling of natural production of chinook salmon from the average production of 1967–1991, consistent with the provisions of State and federal law." (*Id.* at 15 & 18.) The existence of this separate provision, directed at anadromous fish doubling, suggests that neither the Delta outflow objective nor the Vernalis flow requirement [was] intended to achieve the CVPIA fish doubling purpose. Actions taken to comply with the Delta outflow objective and/or the Vernalis flow requirement do not "predominantly" contribute to primary purpose programs. Interior did not abuse its discretion in excluding these actions that consumed approximately 9,000 AF of CVP yield from (b)(2) accounting.

*Id.* at 48–49 (footnotes omitted).

### III. *EVIDENTIARY ISSUES*

Judicial notice was previously taken of the 1995 WQCP. Doc. 711 at 51 n. 18 (taking judicial notice of 1995 WQCP); Doc. 693 (attaching 1995 WQCP). Plaintiffs now request that the court take judicial notice pursuant to Federal Rule of Civil Procedure 201(b)(2) of:

- Revised Water Rights Decision 1641 ("D–1641"), dated March 15, 2000. Exhibit A to Plaintiffs' First Request for Judicial Notice ("PFRJN"), Doc. 717.
- Amended Water Quality Control Plan for the San Francisco Bay/Sacramento–San Joaquin Delta Estuary, dated December 13, 2006. Exhibit B to PFRJN.
- *State Water Resources Control Board Cases*, 2003 WL 25779224, Sacramento County Superior Court. Exhibit C to PFRJN.

- Department of Water Resources Bulletin 132–05, December 2006. Exhibit A to Plaintiffs' Second Request for Judicial Notice ("PSRJN"), Doc. 734.
- Goodwin Reservoir Daily Operations, June 2004. Exhibit B to PSRJN.
- Environmental Impact Report, Appendix to the 1995 WQCP (1995). Exhibit C to PSRJN.
- Final Environmental Impact Report for Implementation of the 1995 WQCP, 1999, p. 189. Exhibit D to PSRJN.

As public records the authenticity of which is not challenged, the existence of all of these documents are properly the subject of judicial notice under Federal Rule of Evidence 201. *See Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir.2001). If the contents are disputed, the documents are not admissible for the truth of their contents. Whether these documents post-date the disputed 2004 actions is addressed below.

### IV. *ANALYSIS*

#### A. *Summary of Plaintiffs' Request.*

Plaintiffs request reconsideration of a narrow issue: the ruling regarding the intended effect of the 1995 WQCP numeric standards as related to the WQCP's "narrative" fish doubling objective. The 9,100 AF of water Interior allocated to Non–B2 Fisheries Actions from June 17 through June 24, 2004 was used to meet the Delta outflow and Vernalis flow standards. First Decl. of Paul Fujitani, Doc. 685–4, at ¶ 17. These two 1995 WQCP numeric flow standards are designed, at least in part to aid fish and wildlife:

The stated purpose of the outflow standard is to protect "estuarine habitat for anadromous fishes and other estuarine-dependent species." (1995 WQCP at 15.) The Vernalis flow requirement on the San Joaquin River, along with simi-

lar flow requirement on the Sacramento River, originate in the WQCP. The stated purpose of the Vernalis flow requirements are "to provide attraction and transport flows and suitable habitat for various life stages of aquatic organisms, including Delta smelt and chinook salmon." (*Id.* at 15.)

Doc. 711 at 50–51.

The September 19, 2008 Decision found that, because the standards "do not specifically identify an intent to support the fish doubling goal (or any other specifically-enumerated 3406(b) program)," actions taken to satisfy these standards do not "predominantly contribute to primary purpose programs." *Id.* Particular note was taken of the fact that "the WQCP contains a wholly separate 'narrative objective' for salmon doubling":

> Water quality conditions shall be maintained, together with [other] measures in the watershed, sufficient to achieve a doubling of natural production of chinook salmon from the average production of 1967–1991, consistent with the provisions of State and federal law.

*Id.* at 51 (citing 1995 WQCP at 15, 18). "The existence of this separate provision, directed at anadromous fish doubling, suggests that neither the Delta outflow objective nor the Vernalis flow requirement were intended to achieve the CVPIA fish doubling purpose." *Id.* at 51.

Plaintiffs maintain this interpretation of this WQCP language constitutes a "mistake in fact regarding the intended effect of the numeric standards in the WQCP." Doc. 733 at 3–4. Plaintiffs argue that the State Water Resources Control Board ("SWRCB") did indeed intend for the numeric standards (e.g., the Delta outflow and Vernalis flow standards) to implement the narrative fish doubling objective.

### B. *Is Plaintiffs' Request A Proper Motion for Reconsideration?*

The Federal Rules of Civil Procedure do not expressly provide for motions for reconsideration. However, a motion for reconsideration may be construed as a motion to alter or amend judgment under either Rule 59(e) (motion to alter or amend judgment) or Rule 60(b) (motion for relief from judgment) if timely filed under a local rule. *See Shapiro ex rel. Shapiro v. Paradise Valley Unified Sch. Dist. No. 69*, 374 F.3d 857, 863 (9th Cir.2004); *Sch. Dist. No. 1J, Multnomah County v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993). "[A] 'motion for reconsideration' is treated as a motion to alter or amend judgment under ... Rule 59(e) if it is filed within ten days of entry of judgment." *Am. Ironworks & Erectors, Inc. v. N. Am. Constr. Corp.*, 248 F.3d 892, 898–99 (9th Cir.2001) (citing *United States v. Nutricology, Inc.*, 982 F.2d 394, 397 (9th Cir. 1992)). If the motion is not filed within ten days of the entry of final judgment, "it is treated as a Rule 60(b) motion for relief from a judgment or order." *Id.* at 899.

Rule 60(b) provides six possible grounds for relief from a final judgment, order or proceeding:

> On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
> (1) mistake, inadvertence, surprise, or excusable neglect;
> (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
> (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
> (4) the judgment is void;
> (5) the judgment has been satisfied, released or discharged; it is based on an

earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6) any other reason that justifies relief. "Rule 60(b) reconsideration is generally appropriate in three instances: (1) when there has been an intervening change of controlling law, (2) new evidence has come to light, or (3) when necessary to correct a clear error or prevent manifest injustice." *United States v. Westlands Water Dist.*, 134 F.Supp.2d 1111, 1131 (E.D.Cal.2001) (citing Sch. Dist. No. 1J, 5 F.3d at 1262).

■■■■ Here, Plaintiffs have moved for reconsideration under Rules 60(b)(1) and (b)(6). Plaintiffs' motion does not satisfy the stringent requirements of Rule 60(b)(6), which is a "catch-all" provision that is used " sparingly as an equitable remedy to prevent manifest injustice." *Lehman v. United States*, 154 F.3d 1010, 1017 (9th Cir.1998) (quoting *United States v. Alpine Land & Reservoir Co.*, 984 F.2d 1047, 1049 (9th Cir.1993)). For Rule 60(b)(6) relief, the moving party must show "both injury and that circumstances beyond its control prevented timely action to protect its interests." *Id.* "Neglect or lack of diligence is not to be remedied through Rule 60(b)(6)." *Id.* (citing *United States v. RG & B Contractors, Inc.*, 21 F.3d 952, 956 (9th Cir.1994)).

■■■■ Whether Plaintiffs' motion is properly brought under Rule 60(b) (1) requires further analysis. Rule 60(b)(1), which applies to "mistake, inadvertence, surprise, or excusable neglect," permits a court to correct its own inadvertence, mistakes of fact, *Kingvision Pay–Per–View Ltd. v. Lake Alice Bar*, 168 F.3d 347, 350 (9th Cir.1999), or mistakes of law, *Liberty*

*Mut. Ins. Co. v. E.E.O.C.*, 691 F.2d 438, 440–41 (9th Cir.1982). However, a Rule 60(b)(1) reconsideration motion should not merely present arguments previously raised, or which could have been raised in the original briefs. *See Backlund v. Barnhart*, 778 F.2d 1386, 1388 (9th Cir.1985) (motion properly denied where it "presented no arguments that had not already been raised in opposition to summary judgment."). "[M]otions to reconsider are not vehicles permitting the unsuccessful party to 'rehash' arguments previously presented ... Nor is a motion to reconsider justified on the basis of new evidence which could have been discovered prior to the court's ruling.... Finally, 'after thoughts' or 'shifting of ground' do not constitute an appropriate basis for reconsideration." *Westlands*, 134 F.Supp.2d at 1130 (citing *United States v. Navarro*, 972 F.Supp. 1296, 1299 (E.D.Cal.1997), rev'd on other grounds, 160 F.3d 1254 (9th Cir.1998)). "These relatively restrictive standards reflect district courts' concern for preserving dwindling resources and promoting judicial efficiency." *Id.*

■■■■ In prior proceedings in this case, issues raised included: (1) the purposes for which the June 17 through June 24, 2004 Non–B2 releases were made, and (2) whether those uses were primarily (as opposed to incidentally) intended to implement the (b)(2) fish doubling mandate. Plaintiffs argue that the September 19, 2008 Decision addressed an issue that was not anticipated by the prior proceedings: whether the Delta outflow and Vernalis flow standards *were intended to contribute toward implementation of the 1995 WQCP's narrative fish doubling standard.*[1]

---

1. Plaintiffs assert that the district court's interpretation of the 1995 WQCP constitutes a "mistake of fact." Defendants rejoin that a court's interpretation of the meaning of the WQCP, which operates as a legal command, is not a "mistake of fact" at all; rather, it is an interpretation of the law, from which Plaintiffs may seek relief on appeal. This is a distinction without a difference in the Ninth Circuit, which permits Rule 60(b)(1) motions

Plaintiffs acknowledge that, even if the interpretation of the SWRCB's intent is reconsidered, it still must be decided whether any such reconsideration necessitates a change in the ruling regarding whether the Bureau abused its discretion by accounting for the 9,100 AF as Non–B2 Fisheries Actions. Plaintiffs seek reconsideration because "otherwise the Court's ruling will [be] interpreted and applied to mean that actions to meet the numeric WQCP standards can never be primary purpose uses...." Doc. 773 at 4. On this limited issue, the motion for reconsideration is proper.

C. *Merits of Plaintiffs' Reconsideration Request.*

1. *1995 WQCP.*

The 1995 WQCP acknowledges that "[t]he waters of the Bay–Delta Estuary serve a multitude of beneficial uses, both within the Estuary and throughout the State. Historically, these beneficial uses have been classified under three broad categories: municipal and industrial, agricultural, and fish and wildlife." 1995 WQCP at 11–12.

To protect these beneficial uses, the WQCP set certain numeric and narrative objectives. The WQCP included "Delta outflow objectives ... for the protection of estuarine habitat for anadromous fishes and other estuarine-dependent species,"[2] while "Sacramento and San Joaquin river flow objectives," such as the Vernalis flow standard,[3] "are included to provide attraction and transport flows and suitable habitat for various life stages of aquatic organisms, including Delta smelt and chinook salmon." *Id.* at 15. The September 19, 2008 Decision recognizes the Delta outflow and Vernalis flow standards were intended to help fish recovery.

■■■ The WQCP includes a narrative objective for salmon protection to ensure increased natural production of salmon.

Water quality conditions shall be maintained, together with [other] measures in the watershed, sufficient to achieve a doubling of natural production of chinook salmon from the average production of 1967–1991, consistent with the provisions of State and federal law.

*Id.* at 15, 18. As to this "narrative objective":

It is uncertain whether implementation of the numeric objectives in this plan alone will result in achieving the narrative objective for salmon protection. Therefore, in addition to the timely completion of a water rights proceeding to implement river flow and operational requirements which will help protect salmon migration through the Bay–Delta Estuary, other measures may be necessary to achieve the objective of doubling the natural production of chinook salmon from average 1967–1991 levels. This narrative objective is consistent with the anadromous fish doubling goals of the CVPIA; thus, prompt and efficient actions taken to implement this CVPIA goal, in concert with other recommended actions in this plan, are important to achieving the narrative salmon protection objective. Monitoring results will be considered in the ongoing review to

to reconsider "errors of law" as well as mistakes of fact. *Liberty Mut.*, 691 F.2d at 441.

2. In general, the Delta outflow standard, X2, fixes the location of the salinity mixing zone, the location where the average electrical conductivity in the Delta is 2.64 mmhos/cm. *See* 1995 WQCP Tables 3 and 4.

3. The Vernalis flow objective on the San Joaquin River requires an average flow rate and a pulse/attraction flow for all water year types. 1995 WQCP at 19.

evaluate achievement of this objective and the development of numeric objectives to replace it.

*Id.* at 28. To the extent that the September 19, 2008 Memorandum Decision suggested that the WQCP's numeric objectives do not contribute toward the narrative salmon doubling goal, it was incorrect. By expressing uncertainty whether the numeric objectives *alone* will achieve the narrative salmon doubling objective, the WQCP implies that implementation of the numeric objectives will at least *contribute toward* the narrative salmon doubling objective. Plaintiffs' motion to reconsider the ruling regarding the intended effect of the 1995 WQCP numeric standards in relation to the WQCP's "narrative" fish doubling objective is GRANTED. The WQCP indicates that "other measures" may be required to accomplish the CVPIA's anadromous fish doubling goal. That the WQCP's numeric standards may assist the implementation of the narrative fish doubling objective does not resolve whether CVP water committed to the Delta outflow and Vernalis flow requirements at any particular time is designed to *"predominantly contribute"* to one of the CVPIA primary purpose programs (e.g., anadromous fish doubling), so as to require counting water used to meet such requirements against the 800,000 AF limit.

### 2. *D–1641*

The SWRCB issued D–1641 in December 1999. It was amended in March 2000. A stated purpose of D–1641 is to "recognize the San Joaquin River Agreement (SJRA) and approve, for a period of twelve years, the conduct of the Vernalis Adaptive Management Plan (VAMP) under the SJRA instead of meeting the objectives in the 1995 Bay–Delta Plan...." D–1641 at 2. VAMP is an experimental program designed to:

Assess the effect of export pumping at various specific river flows.... Under the VAMP experiment, the flows at Vernalis during the April–May pulse flow period could be lower than is required by the objectives in the 1995 Bay–Delta Plan, and the export pumping rates would be lower than the pumping rates allowed in the Plan.

\* \* \*

The purpose of the VAMP is to gather scientific information on the relative effects on the survival and passage of salmon smolts through the Delta caused by (1) flows in the lower San Joaquin River and (2) CVP and SWP export pumping rates. (SJRGA 2, p. 3.) The study will be conducted during the April–May period when the 1995 Bay–Delta Plan calls for pulse flows in the San Joaquin River at Vernalis. Existing studies have not provided satisfactory results on the relative effects of flows and exports on smolt passage and survival. Additional studies are needed to clarify these effects (R.T. pp. 876, 883, 889.) The VAMP experiment is a unique opportunity for collecting data under controlled conditions because of the commitment of the DWR and USBR to control exports and releases from New Melones Reservoir, and operate the head of Old River barrier as needed for the experiment. As stated by the USDI, the VAMP provides a consistent framework for gathering this information. (USDI 1, p. 5)

*Id.* at 19, 21.

D–1641 indicated that, although additional measures might be needed to implement the narrative objective for salmon protection, "[a] period of actual operation meeting the numerical objectives in the 1995 Bay–Delta Plan or the measures under the SJRA/VAMP, coupled with ade-

quate monitoring, is required before the SWRCB can determine whether additional implementation measures are needed to meet this objective." *Id.* at 61.

This language further supports the finding, as Plaintiffs assert, that the SWRCB intended for the numerical flow objectives to contribute to the fish doubling objective. This does not settle the ultimate question presented by the cross motions in this case: whether the water released from June 14 through June 24 was released to comply with a requirement that has as its predominant objective implementation of the CVPIA's fish-doubling goal.

### D. *2003 SWRCB Cases Trial Court Decision.*

The Pacific Coast Federation of Fishermen's Associations ("PCFFA") filed suit against the SWRCB in state court, arguing that due to deficiencies in D–1641, the SWRCB failed to implement the 1995 WQCP. This suit was consolidated with a number of other, related matters. *See SWRCB Cases,* 2003 WL 25779224. Among other things, PCFFA argued: (1) flows under the numeric standards alone will not achieve salmon doubling; (2) the flows under the experimental VAMP program are insufficient to achieve salmon doubling and are so low as to frustrate the efforts of other agencies working toward fish recovery; and (3) implementation of the salmon doubling requirement was to be "immediate" under the 1995 WQCP, but VAMP will proceed over a twelve year period and still not achieve the objective.

The state court rejected these arguments, because, although "[s]almon-doubling was an important objective of the 1995 Plan," the SWRCB "never relied solely on flows to achieve that goal." Rather, the 1995 WQCP "intended that the Board act in concert with many other responsible parties, and flows were to be one of many curative measures." *Id.* at *61.

The 1995 WQCP recognized that implementation of the plan would be informed by the results of monitoring and experiments like VAMP, and that the salmon-doubling requirement was not an objective that "could reasonably be met by the flow of water or by changes in the operations of facilities." Moreover, it is "simply unreasonable to insist that D–1641 empirically ensure a doubling of salmon survival rates." Rather, "substantial evidence in the record demonstrates that D–1641 supports and advances the narrative goal of doubling salmon survival." *Id.* at *78.

The trial court decision in *SWRCB Cases* corroborates the contention that the numerical flow objectives support and advance the narrative salmon-doubling goal, but does not resolve the issue of whether the Delta outflow and Vernalis flow objectives are designed to "predominantly contribute" to one of the primary purpose programs (e.g., fish doubling).

### E. *The 2006 SWRCB Cases Appellate Decision & Subsequent Revision of the WQCP on Remand.*

The *SWRCB Cases* decision was appealed by multiple parties. The Court of Appeal, Third Appellate District, issued a decision in 2006, two years after the (b)(2) accounting actions challenged in this case. *SWRCB Cases,* 136 Cal.App.4th 674, 39 Cal.Rptr.3d 189 (2006). The appellate court confirmed that the SWRCB's intent was that the WQCP numeric standards would be used to achieve, at least in part, the narrative objective for salmon doubling, but ruled that D–1641, did not sufficiently implement the narrative objective because it used the SJRA/VAMP program instead of the WQCP's Vernalis flow objective. *Id.* at 773–76, 39 Cal.Rptr.3d 189. The issue of how to implement the WQCP's numeric flow standards to fulfill

the fish doubling requirement was remanded to the SWRCB.

In response, the SWRCB amended the WQCP in 2006:

> Narrative Objective for Salmon Protection
>
> D–1641 assigned responsibility to the USBR and DWR to comply with the river flow and operational objectives for fish and wildlife. These objectives help protect salmon migration through the Bay–Delta estuary. D–1641 did not require separate actions to implement the narrative objective for salmon because the State Water Board expects that implementation of the numeric flow-dependent objectives and other non-flow measures will implement that objective.

Amended WQCP at 33.

Neither the appellate court's decision nor the 2006 Amendment to the WQCP were before the Bureau at the time of the challenged (b)(2) accounting actions in 2004. These later actions cannot be considered in a case challenging the Bureau's exercise of discretion in the 2004(b)(2) accounting year. "Review of agency action is limited to the record considered and relied upon by the agency at the time a decision is made." *Wilderness Soc'y v. Dombeck,* 168 F.3d 367, 377 (9th Cir.1999) (citing *Nat'l Wildlife Fed'n v. Burford,* 871 F.2d 849, 855 (9th Cir.1989)).

Even if the 2006 appellate court decision and subsequent amendment of the WQCP, could be considered, the result is not different. That the numerical flow objectives *support and advance* the 1995 WQCP's narrative salmon-doubling goal, does not resolve the question of whether the Delta outflow and Vernalis flow objectives are designed to "predominantly contribute" to one of the CVPIA's primary purpose programs (e.g., fish doubling).

### F. Did the Bureau Abuse Its Discretion With Respect to the June 2004 Actions?

#### 1. Standard of Review.

This case concerns a challenge to administrative agencies' implementation of the CVPIA. Because the CVPIA contains no private right of action or provision for judicial review, the Administrative Procedure Act ("APA") governs judicial review of agency action in this case. 5 U.S.C. §§ 701–706. Under the APA, federal courts can only review whether agency decisions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "This deferential standard is designed to ensure that the agency considered all of the relevant factors and that its decision contained no clear error of judgment." *Pac. Coast Fed'n of Fishermen's Ass'ns v. NMFS,* 265 F.3d 1028, 1034 (9th Cir.2001) (*"PCFFA"*). Agency action should only be overturned if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Nat'l Ass'n of Home Builders v. Defenders of Wildlife,* 551 U.S. 644, 127 S.Ct. 2518, 2529, 168 L.Ed.2d 467 (2007) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). Essentially, a court must ask "whether the agency considered the relevant factors and articulated a rational connection between the facts found and the choice made." *PCFFA,* 265 F.3d at 1034.

As a general rule, a court must defer to the agency on matters within its expertise. *See Nat'l Wildlife Fed'n v.*

*Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 798 (9th Cir.2005). "Deference to the informed discretion of the responsible federal agencies is especially important, where, as here, the agency's decision involves a high level of technical expertise." *Id.* However, "[t]he deference accorded an agency's scientific or technical expertise is not unlimited." *Id.* "Deference is not owed when the agency has completely failed to address some factor consideration of which was essential to [making an] informed decision." *Id.* (internal citations and quotations omitted). Nevertheless, a court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Home Builders*, 127 S.Ct. at 2530.

### 2. *Analysis.*

The September 19, 2008 ruling found that Interior did not abuse its discretion with respect to the June Actions:

From June 17 through June 24, 2004 Interior allocated 9,100 AF to Non–B2 Fishery Actions. The daily accounting for June 17 through June 30, 2004 indicates that water costs were being incurred for changes in operations at Nimbus, Clear Creek, and New Melones. (First Fujitani Decl. at ¶ 17.) Only those costs incurred at Nimbus and New Melones were accounted for as Non–B2 Fishery Actions. (*Id.*) A draft document entitled "Summary of (b)(2) Fish Actions for Water Year 2004," dated December 1, 2004, specifies that releases from Nimbus during the "latter part" of June were "to meet Delta demands." (AR 1521.) Mr. Fujitani states that releases from Nimbus were required to meet the June Delta outflow standard. (First Fujitani Decl. at ¶ 17.) Releases from New Melones were needed to meet San Joaquin River flow requirements at Vernalis. (*Id.*) Interior did not count these releases as "(b)(2)" releases, but instead as "Non–B2 Fishery Actions." (*Id.*)

The question presented is: Did either of these actions predominantly contribute to one of the (b)(2) primary purpose programs (e.g., fish doubling)? The Delta outflow standard was promulgated as part of the 1995 WQCP (D–1641). The stated purpose of the outflow standard is to protect "estuarine habitat for anadromous fishes and other estuarine-dependent species." (1995 WQCP at 15.) The Vernalis flow requirement on the San Joaquin River, along with similar flow requirement on the Sacramento River, originate in the WQCP. The stated purpose of the Vernalis flow requirements are "to provide attraction and transport flows and suitable habitat for various life stages of aquatic organisms, including Delta smelt and chinook salmon." (*Id.* at 15.)

Although both of these standards are to benefit anadromous fish species, they do not specifically identify an intent to support the fish doubling goal (or any other specifically-enumerated 3406(b) program). In fact, the WQCP contains a wholly separate "narrative objective" for salmon doubling, which provides: "Water quality conditions shall be maintained, together with [other] measures in the watershed, sufficient to achieve a doubling of natural production of chinook salmon from the average production of 1967–1991, consistent with the provisions of State and federal law." (*Id.* at 15 & 18.) The existence of this separate provision, directed at anadromous fish doubling, suggests that neither the Delta outflow objective nor the Vernalis flow requirement were intended to achieve the CVPIA fish doubling purpose. Actions taken to comply with the Delta outflow objective and/or the Vernalis flow requirement do not "predominantly" contribute to primary purpose programs. Interior did not abuse its discretion in excluding these actions

that consumed approximately 9,000 AF of CVP yield from (b)(2) accounting.

Doc. 711 at 48–49 (footnotes omitted). This was premised on the finding that neither the Delta outflow nor Vernalis flow requirements were intended to contribute toward the *CVPIA's* fish doubling requirement. On reconsideration, it is recognized that these flow requirements were intended to *contribute toward* the narrative fish doubling objective contained within the 1995 WQCP. Whether the Delta outflow and Vernalis flow standards were "predominantly" designed to implement the CVPIA's fish doubling requirement presents a mixed question of fact and law.

 The summary judgment record contained very little specific information pertaining to this issue. Paul Fujitani, Chief of the Water Operations Division in the Bureau's Central Valley Operations Office, Doc. 685 at ¶ 1, declared:

> The daily accounting for (b)(2) indicates that from June 17, 2004 to June 30, 2004, costs were being accumulated due to changes in operations at Nimbus, Clear Creek, and New Melones. Only costs incurred at Nimbus and New Melones were shown as "Non–B2 Fishery Actions" (AR 2565, 3184). Costs identified as "Non–B2 Fishery Actions" in these tables refer to water quality control plan actions that were not credited against the 2004(b)(2) account. The changes in operations at both Nimbus and New Melones were required to meet water quality control plan objectives. The release from Nimbus Reservoir assisted in meeting the June water quality control plan Delta outflow standard and the release from New Melones Reservoir was needed to meet San Joaquin River flow requirements at Vernalis (AR 2565). Interior exercised its discretion in accordance with the Ninth Circuit's amended decision and refrained from accounting the water quality control plan

> costs at Nimbus and New Melones during the period as (b)(2) actions.

*Id.* at ¶ 17. Mr. Fujatani does not explain the basis for the decision not to count the Nimbus and New Melones uses against CVP yield.

Roger Guinee, the Water Operations Division Chief for the United States Fish and Wildlife Service's Water and Fishery Resources Program, Doc. 685–5 at ¶ 1, provides a similar explanation:

> 12. From June 17, 2004 to June 30, 2004, Interior exercised its discretion under the Ninth Circuit's amended decision to refrain from accounting the WQCP costs on the American and Stanislaus rivers as (b)(2) actions, and accounted approximately 9,000 acre-feet of water used for water quality control plan actions as "Non–B2 Fishery Actions." (AR 2565, 3182–85). When the Service and Reclamation presented the final (b)(2) accounting for WY 2004, the Service described the portion of the upstream actions in June, 2004 that were used to meet the WQCP and not accounted as (b)(2) water. American River flows (Nimbus releases), in "the latter part of the month releases were increased to June, 2004 assisted in meeting the WQCP's Delta outflow standard...." The Service did not recommend this flow increase to meet the primary fish, wildlife and habitat restoration purposes of CVPIA (AR 2565).

> 13. The Service also described the portion of the June, 2004 Stanislaus River flows used to meet WQCP and not accounted as (b)(2) water, "... (Goodwin releases) were augmented ... to help meet WQCP Vernalis flow requirements." (AR 1521).... The Service did not recommend this flow increase to meet the primary fish, wildlife and habitat restoration purposes of CVPIA (AR 2565)

*Id.* at ¶ 13–14. These declarations show, and Plaintiffs do not dispute, that the 9,100 AF accounted for as "Non–B2 Fisheries Actions" in late June were releases made to satisfy either the Delta outflow or Vernalis flow numeric standards contained in the 1995 WQCP, not (b)(2) anadromous fish doubling. Neither Mr. Fujitani nor Mr. Guinee explain *why* these releases were not considered "primary (b)(2) purpose" actions, although Mr. Guinee indicates that FWS "did not recommend [these] flow increase[s] to meet the primary fish, wildlife and habitat restoration purposes of [the] CVPIA." *Id.* at ¶¶ 13–14.

In response to Plaintiffs' motion for reconsideration, and to support a finding that the "Non–B2 Fisheries Actions" taken under the WQCP did *not* predominantly contribute to one of the (b)(2) primary purpose programs, Environmental Plaintiffs present the declaration of Christina Swanson, Ph.D., a fisheries biologist with The Bay Institute of San Francisco. Doc. 727. Dr. Swanson's previous declaration was considered during the summary judgment proceedings. In general, Dr. Swanson opines that, "[w]hile increased freshwater flows are generally good for fish and for environmental conditions in the altered ecosystem of the Delta, it does not reasonably follow that the actions needed to com-

ply with the water quality standards would be the same actions one would take if the primary goal were to double salmon populations on CVP streams." Doc. 727 at ¶ 4. Dr. Swanson asserts that "most biologists working in the Bay–Delta system recognize [that] the most important requirements for salmon protection and doubling are flow standards for rivers and tributaries upstream of the delta where salmon spawn and rear." *Id.* at ¶ 5. It is her understanding that "the relevant fishery agencies agree with this view," citing the Final EIR for the 1995 WQCP at p. III–86 ("1995 WQCP FEIR"), which proposes, among other things, to establish minimum flows for CVP streams. *Id.*

Dr. Swanson opines that the Delta outflow objective primarily benefits non-salmonid fish species, citing portions of the 1995 WQCP FEIR, reporting that positive correlations have been observed between Delta outflow in spring and early summer and abundance of white sturgeon[4], bay shrimp, *Crangon franciscorum*, longfin smelt, and Sacramento splittail. *Id.* at ¶ 6 (citing 1995 WQCP FEIR at III–32, IV–15).[5] The stated purpose of the outflow standard is to protect "estuarine habitat for anadromous fishes and other estuarine-dependent species." 1995 WQCP at 15. Plaintiffs do not dispute this assertion, nor do they point to any evidence suggesting

---

**4.** For the purposes of the CVPIA, the term "anadromous fish," used in § 3406(b)(1)'s anadromous fish doubling requirement, means "those stocks of salmon (including steelhead), striped bass, *sturgeon*, and American shad that ascend the Sacramento and San Joaquin rivers and the tributaries and the Sacramento–San Joaquin Delta to reproduce after maturing in San Francisco Bay or the Pacific Ocean." § 3403(a) (emphasis added). The anadromous fish doubling requirement arguably encompasses sturgeon, although no party has explicitly offered evidence establishing that white sturgeon are within the statutory definition. Nevertheless, the Delta outflow standards appear to aid several other fish

species not covered by the CVPIA's definition of anadromous, including bay shrimp, *Crangon franciscorum*, longfin smelt, and Sacramento splittail.

**5.** Swanson also suggests that the Delta outflow standard is meant to protect "drinking, industrial, and irrigation water quality." *Id.* at ¶ 5 (citing 1995 WQCP FEIR at III–106). However, even if the Delta outflow affects a variety of beneficial uses, the State Board specifically indicated that the justification for the Delta outflow X2 standard was "to provide sufficient Delta outflow to protect fish and wildlife beneficial uses in the Delta." 1995 WQCP FEIR at VI–189.

that the particular releases in question were likely to predominantly benefit anadromous fish species, as opposed to the other, non-anadromous species identified as beneficiaries of the Delta outflow standard in the 1995 WQCP. Absent such evidence and in light of the fact that the 1995 WQCP FEIR indicates that the Delta outflow standard is intended to benefit multiple species, the Bureau did not abuse its discretion by concluding that flow releases made to satisfy the outflow standard in late June 2004 were not required to be counted toward the (b)(2) account. There is a rational correlation between the facts and Federal Defendants' decision.

■ The water released in late June 2004 to comply with the Vernalis flow standard presents a closer question. Like the Delta outflow standard, the Vernalis flow requirement is intended to serve multiple fish species by "provid[ing] attraction and transport flows and suitable habitat for various life stages of aquatic organisms, including Delta smelt and chinook salmon." 1995 WQCP at 15. Dr. Swanson suggests that, in late June 2004, the releases in question could not have benefitted salmon, as "[t]he great majority of juvenile salmon

from the San Joaquin River were no longer in the river by that time and the agencies were not even sampling for juvenile salmon on the San Joaquin River at that time." Doc. 727 at ¶ 9.

In response, Plaintiffs submit the Declaration of John Snow, Westlands' Deputy General Manager for Water Policy. Doc. 732. His previous declaration was considered during the summary judgment proceedings. Mr. Snow does not dispute the fact that "[t]he great majority of juvenile salmon from the San Joaquin River were no longer in the river by that time...." Instead, he suggests that this is of no legal consequence because "[t]he State Water Resources Control Board ('Water Board') has stated that the purpose of the Vernalis Flow standard is 'to improve survival of salmon smolts emigrating down the San Joaquin River and to improve habitat conditions in the central and southern Delta for numerous aquatic species.'" *Id.* at ¶ 7 (citing 1995 WQCP Draft EIR, at VIII–24, Exh. C). Accepting this statement of the Board's intent, articulated in a Draft EIR, does not establish that the Vernalis flow standard *predominantly* aids, as opposed to merely contributes to the support of, salmonid or other anadromous fish population covered by CVPIA § 3406(b)(1).[6] The

---

**6.** Dr. Swanson suggests an alternative reason why the water may have been released from New Melones in late June 2004. Because the Jones Tract levee broke that year, WQCP salinity standards in the south Delta were violated. She recalled that "extra releases on the Stanislaus River that year were made to meet the Vernalis flow objectives and to minimize the salinity violation/problem, and that these releases were not made for salmon doubling purposes." Specifically, she notes that the WQCP standard for salinity at Vernalis, which is intended to protect "agricultural and beneficial uses of water" in the Southern Delta, *see* 1995 WQCP FEIR at VII–71, requires the 30–day average salinity (measured as electrical conductivity, EC) to be 0.7 or lower in June. Doc. 727 at ¶ 8. In early June 2004, according to water quality reports, the average daily salinities at Vernalis were increasing and exceeded 0.7 for nine consecutive days. *Id.* Dr.

Swanson opined that "the only management response available to the Bureau of Reclamation to avoid violating this water quality standard was to increase releases from the Stanislaus River, an action that was also necessary to meet the [Vernalis] flow standard." *Id.*

Mr. Snow disagrees on several grounds. For example, he asserts there were no violations of the south Delta salinity standard in June 2004, which is a 30–day average standard. *Id.* at ¶ 4. In fact, the report cited by Dr. Swanson indicates the 30–day standard was not violated in June. Doc. 732 at ¶ 4. More important is the fact that the Bureau did not subscribe to Dr. Swanson's explanation for the releases. The (b)(2) accounting report for the relevant time period that indicates that Stanislaus River releases were made to "help meet WQCP Vernalis flow requirements." "Although a decision of less than ideal clarity may be upheld if the agen-

predominant use of water under the Vernalis standard is disputed.

The September 19, 2008 Memorandum Decision recognized that there is "potential for overlap between the 'primary' purpose and actions taken pursuant to the fisheries purposes of the WQCP and ESA," Doc. 711 at 46, and concluded:

> [I]f an action taken under the WQCP ... predominantly contributes to one of the primary purpose programs (e.g., fish doubling), it must be counted toward the 800,000 AF limit. Interior retains the discretion not to count other secondary actions, so long as doing so is necessary to give effect to the hierarchy of purposes.

*Id.* at 48. As to such a decision on a subject, water accounting, inherently within the agency's discretion and expertise, the deferential standard favoring the agency's decision is not overcome. Based on the totality of the information available to the Bureau at the time, including the fact that the Vernalis flow standard is designed to serve multiple purposes, not just anadromous fish doubling, coupled with the fact that there were no salmon present in the San Joaquin system in late June 2004, the Bureau exercised discretion and did not abuse it in not counting water released to comply with the Vernalis flow standard toward the (b)(2) account. Even though the Bureau's rationale was not clearly articulated in the record, a court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Home Builders*, 127 S.Ct. at 2530.[7] In the future, the Agency should provide clear explanations why multi-purpose CVP water use that partially benefits anadromous fish should or should not be charged against the (b)(2) annual 800,000 AF allocation.

## V. *CONCLUSION*

For these reasons, Plaintiffs' motion for reconsideration is GRANTED and the finding is made that the State Board intended for the numeric flow standards in the 1995 WQCP to contribute toward the narrative fish doubling goal in the WQCP. This does not resolve whether water used for WQCP purposes also is predominantly used for primary CVPIA 3406(b)(2) purposes. The September 19, 2008 ruling stands. The disputed actions were within the Federal Defendants' discretion and expertise in managing the CVP and implementing the CVPIA. This discretion was not abused by not charging against the (b)(2) account, CVP water released in late June 2004 to comply with the 1995 WQCP's Delta outflow and Vernalis flow requirements under the unique conditions that then existed.

Plaintiffs shall submit a form of order consistent with this Memorandum Decision within five days of electronic service.

SO ORDERED.

---

cy's path may reasonably be discerned, [a court] cannot infer an agency's reasoning from mere silence. Rather, an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Pac. Coast Fed'n of Fishermen's Ass'ns v. United States Bureau of Reclamation,* 426 F.3d 1082, 1091 (9th Cir.2005) (internal citations and quotations omitted).

7. The determination of primary purpose use of CVP water for (b)(2) anadromous fish doubling is committed to the Bureau's sound discretion, to be exercised in good faith in light of chronic CVP water shortages, to achieve Congress' objectives under the CVPIA.